IN THE DISTRICT COURT IN AND FOR OKLAHOMA COUNTY
STATE OF OF OKLAHOMA

| | |
|---|---|
| (1)  ANITA SUE GONZALEZ, individually and in her capacity as the Personal Representative of the Estate of LUIS ALBERTO GONZALEZ, JR., deceased, §§§§§ | **FILED IN DISTRICT COURT OKLAHOMA COUNTY** **DEC 16 2024** **RICK WARREN COURT CLERK** |
| Plaintiff, §§ | |
| v. §§ | Case No. _____ 112 _____ |
| (1)  OKLAHOMA COUNTY CRIMINAL JUSTICE AUTHORITY; §§§ | **CJ-2024-8093** |
| (2)  BOARD OF COUNTY COMMISSIONERS FOR OKLAHOMA COUNTY; §§§§ | *Attorney Lien Claimed* *Jury Trial Demanded* |
| (3)  TURN KEY HEALTH CLINICS, LLC, f/k/a ESW CORRECTIONAL HEALTHCARE; and §§§§ | |
| (4)  DOES 1-30. §§ | |
| Defendants §§ | |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff Anita Sue Gonzalez, individually and in her capacity as the Personal Representative of the Estate of Luis Alberto Gonzalez, deceased ("Anita Sue Gonzalez" or "Sue Gonzalez") hereby files this Original Petition against Defendants Oklahoma County Criminal Justice Authority ("OCCJA" or "Jail Trust"); Board of County Commissioners for Oklahoma County ("Board", "BOCC" or "Oklahoma County"); Turn Key Health Clinics, LLC, f/k/a ESW Correctional Healthcare ("Turn Key"); Does 1-20 ("Jail Guards" or "Detention Officers" or "Jail Personnel"); and Does 21-30 ("Medical Personnel") (Jail Guards together with Medical Personnel, the "Jail Staff") (all Defendants collectively, the "Defendants").

1

**EXHIBIT 2**

## I. THE PARTIES

### A. PLAINTIFF ANITA SUE GONZALEZ

1.    Plaintiff Anita Sue Gonzalez is an individual and the Personal Representative of the Estate of Luis Alberto Gonzalez, Jr., deceased. Sue Gonzalez is a citizen of the State of Oklahoma and a resident of Oklahoma County. Luis Alberto Gonzalez, Jr. was the son of Sue Gonzalez.[1]

### B. DEFENDANT OKLAHOMA COUNTY CRIMINAL JUSTICE AUTHORITY

2.    Defendant Oklahoma County Criminal Justice Authority ("OCCJA" or "Jail Trust") is a public trust created for the furtherance of purported public functions pursuant to 60 Okla. Stat. § 176, *et seq.* OCCJA was created by a certain "Trust Indenture." Under the Trust Indenture, OCCJA is to "assist" Oklahoma County in its stated objective of operating the Oklahoma "Jail Facilities", which includes the Oklahoma County Detention Center ("Oklahoma County Jail" or "Jail"). Under the Trust Indenture, OCCJA was delegated the responsibility of developing policies and procedures to address the administration of the Jail. However, since June 1, 2020, OCCJA has remained the County entity with primary responsibility for the management and operation of the Jail. The Oklahoma County Sheriff and a member of the Oklahoma County Board of County Commissioners are permanent members/trustees of the OCCJA. OCCJA is sued under Plaintiff's municipal liability theory.

### C. DEFENDANT BOARD OF COUNTY COMMISSIONERS FOR OKLAHOMA COUNTY

3.    Defendant Board of County Commissioners for Oklahoma County ("Board", "BOCC" or "Oklahoma County") is the legislative entity with non-delegable statutory

---

[1] Sue Gonzalez was born in the United States and is a United States citizen. Sue is White, not Hispanic or Latino. Sue referred to her son as "Louie".

2

EXHIBIT 2

responsibility for providing a jail facility for Oklahoma County, Oklahoma that is adequate for the safe-keeping of inmates and detainees. *See* 57 O.S. § 41. As a matter of Oklahoma law, BOCC exercises the powers of the county. *See* 19 Okla. Stat. § 3. A suit brought against BOCC is the way Oklahoma law contemplates suing the county. *See* 19 Okla. Stat. § 4. BOCC is charged with ensuring that the Jail has adequate funding and resources to provide constitutionally sufficient conditions of confinement.

### D. DEFENDANT TURN KEY HEALTH CLINICS, LLC

4.      Defendant Turn Key Health Clinics, LLC, f/k/a ESW Correctional Healthcare ("Turn Key") is an Oklahoma limited liability company doing business in Oklahoma County, Oklahoma. Turn Key as a medical staffing company is based in Oklahoma City, Oklahoma. Turn Key is a private correctional health care company that contracts with counties, including Oklahoma County, to provide medical professional staffing, supervision, and care in county jails. At all relevant times, Turn Key was contracted by Oklahoma County/OCCJA to fulfill the day-to-day healthcare operations at the Oklahoma County Jail. Turn Key was, at all times relevant hereto, responsible, in part, for providing medical services, supervision, and medication to Luis Alberto Gonzalez, Jr., while he was in custody at the Jail. Turn Key was additionally responsible, in part, for creating, implementing, and maintaining policies, practices, and protocols that govern the provision of medical and mental health care to inmates at the Jail, and for training and supervising its employees and agents who were assigned to provide medical care at the Oklahoma County Jail. Turn Key was endowed by Oklahoma County/OCCJA with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

EXHIBIT 2

### E. DEFENDANTS DOES 1-30

5.      Defendants Does 1-30 are currently unnamed individual defendants that Sue Gonzalez intends to name as defendants in this action after initial discovery. Collectively, Does 1-20 ("Jail Guards" or "Detention Officers" or "Jail Personnel") represent all Oklahoma County Detention Center employees that were on duty or physically present at the Oklahoma County Jail at any time from December 11, 2022, through December 21, 2022. Collectively, Does 21-30 (the Medical Personnel) represent all physicians, nurses, physician assistants, nurse practitioners, medical providers, etc. that were on duty or physically present at the Oklahoma County Jail at any time from December 11, 2022, through December 21, 2022.

## II. JURISDICTION & VENUE

6.      This District Court has subject matter jurisdiction over this case because it has unlimited original jurisdiction under Article VII, § 1 (A) and (C) of the Oklahoma Constitution, which gives district courts jurisdiction over all civil actions to uphold and adhere to the Oklahoma Constitution, established common law, and the Oklahoma Statutes and rules promulgated thereto.

7.      Defendant Oklahoma County Criminal Justice Authority at all times mentioned herein, is an entity having its principal place of business in Oklahoma County, State of Oklahoma.

8.      Defendant  Board of County Commissioners for Oklahoma County at all times mentioned herein, is an entity having its principal place of business in Oklahoma County, State of Oklahoma.

9.      Defendant  Turn Key Health Clinics, LLC, f/k/a ESW Correctional Healthcare, at all times mentioned herein, is an entity having its principal place of business in Oklahoma County, State of Oklahoma.

EXHIBIT 2

10.     This Court has personal jurisdiction over the Defendants, as they are all domiciled in the state of Oklahoma and/or municipal entities organized pursuant to the laws of Oklahoma.

11.     This Court has personal jurisdiction over the Defendants, as they are all domiciled in the state of Oklahoma, created pursuant to the laws of Oklahoma, and/or conduct business in and throughout Oklahoma and have deliberately engaged in significant acts and omissions within Oklahoma that have injured citizens of Oklahoma. Defendants also have sufficient minimum contacts with the State of Oklahoma. Defendants have purposefully availed themselves of the privilege of conducting business in Oklahoma such that they are subject to suit here. Additionally, Defendants have targeted their wrongful conduct at Oklahoma. Plaintiff's claims arise out of and relate to Defendants' contacts with the State. This Court's exercise of jurisdiction is reasonable; the maintenance of this suit does not offend traditional notions of fair play and substantial justice.

12.     Venue is proper in this district under 12 O.S. § 133, 12 O.S. § 134, 12 O.S. § 139, and 12 O.S. § 143, as the Defendants do business in this district and the events giving rise to the claims occurred in this district.

### III. FACTUAL BACKGROUND AND ALLEGATIONS
### COMMON TO ALL COUNTS

13.     Plaintiff incorporates all previous allegations and statements as if fully restated herein.

- **SUNDAY, DECEMBER 11, 2022 - THE INCIDENT REPORT**

14.     The Incident Report,[2] reveals that Oklahoma City Police Officer Aaron English arrived on the scene of a reported disturbance at around 4:30 p.m. on December 11, 2022.[3]

---

[2] *See* Incident Report, The City of Oklahoma City Police, Incident No. 2022-0089194, CAD ("Computer Aided Dispatch") Incident No. 202212-0027937, Incident Date 12/11/2022.

[3] *Id.* Narrative Information, at page 6.

EXHIBIT 2

15.    The argument and disturbance was between Luis Alberto Gonzalez, Jr. ("Luis Gonzalez" or "Luis" or "Louie") and his biological brother Michael. Luis had punched his brother in the left ear and they both had bitten each other.[4]

16.    The Incident Report discloses that "Michael previously worked as a Detention Officer" and was able to subdue Luis.[5]

17.    According to Sue Gonzalez, Louie had Type 1 diabetes since he was a little boy and suffered from manic bipolar disorder.[6]

18.    Before December 11, 2022, Sue said, "Louie was having a mental health episode, which impacts his ability to maintain his blood sugar."[7]

19.    Soon after Luis Gonzalez had died, Sue Gonzalez explained the condition of her son to the media as follows:

> "It makes them where he's not thinking correctly. And with the bipolar, he surely wasn't thinking correctly,.." [8]

20.    Sue Gonzalez also shared the reason the family called the police:

> "We called the police to get him the help that he needed. Just maintain him so they can calm him down." [9]

---

[4] *Id.*

[5] *Id.*

[6] *See* Katelyn Ogle, *Mother searching for answers after son dies in Oklahoma County Jail,* NEWS 4-KFOR, (January 4, 2023). https://kfor.com/news/local/mother-searching-for-answers-after-son-dies-in-oklahoma-county-jail/

[7] *Id.*

[8] *Id.*

[9] *Id.*

EXHIBIT 2

21.     The Incident Report divulges that "Body Worn Camera and Fleet footage is available for this incident."[10]

22.     All police officers' bodycam videos and police vehicle videos were  marked and identified by the Oklahoma City Police Department ("OKCPD") as "MENTAL-PATIENT-MEDICAL" for this incident.

23.     The Narrative Information written by Officer Aaron English within the Incident Report of concludes with the following:

> I transported Luis to the Oklahoma County Detention Center, originally.  Luis began to complain that "his blood hurt".  I called for EMSA to check on him. The EMSA crew learned that his blood sugar was above average.[11]     I transported Luis to St. Anthony's so he could be medically cleared to booking.
>
> I have had multiple interactions with Luis.  Luis is a victim of bi-polar disorder.[12]  Luis has very large mood swings.  At one moment he can be friendly and compliant, the next he becomes hostile and violent.
>
> I transported Luis back to the Oklahoma County Detention Center where he was booked in on the above listed charges.[13]

- **SUNDAY, DECEMBER 11, 2022  - POLICE VEHICLE VIDEO OF OFFICER ENGLISH**

24.     The OKCPD police vehicle video beginning at 4:55 p.m. on December 11, 2022 has Luis in transport to the Oklahoma County Jail.

25.     Luis ask Officer Aaron English to make sure that when he takes him into the Oklahoma County Jail that he be placed on the 13th floor because he is a diabetic and will probably

---

[10] *See* Incident Report, Narrative Information, at page 6.

[11] Luis suffered from Type 1 diabetes his entire life.

[12] Luis suffered from bi-polar disorder a serious mental illness his entire life.

[13] *See* Incident Report, Narrative Information, at page 7.

7

EXHIBIT 2

die tonight. (Floor 13 of the Oklahoma County Detention Center is reserved for the sickest of inmates.)[14]

26.    *Upon information and belief, Defendants had knowledge of Luis as suffering from mental illness and diabetes from his previous visits to the Oklahoma County Jail.*

27.    At 4:57 p.m. Luis suggest, while still in transit, that he probably needs to go to the hospital first because he's diabetic and he states that his blood sugar "is way off the chart right now."

28.    At 5:05 p.m Luis collapses in the backseat of the police vehicle and is laying down. The video shows Luis moaning and crying inside the police vehicle.

29.    At 5:10 p.m. Luis starts repeating again and again that his blood is killing him and that his blood sugar is so high it hurts.

30.    At 5:11 p.m Luis says he has no control over his diabetes and he's dying.  Luis is obviously not feeling well.

31.    Officer English calls dispatch, stating that he's in jail transport, and requesting that EMSA be present at the Oklahoma County Jail upon his arrival. Dispatch confirms.

32.    Luis quietly says to Officer English, "Thank you, sir."

33.    At 5:15 p.m. Luis's condition is worsening and is obviously in great pain while the police vehicle is parked outside the Oklahoma County Jail waiting for EMSA to arrive.

34.    At 5:24 p.m. police officers open the back door of the vehicle and ask Luis what is wrong.  Luis mutters between his groans disjointed words; "blood sugar" - "high" - "keto" - "acidosis" - "problems".

_____

[14] *See* Brett Dickerson, *Oklahoma County Jail flunks surprise July health inspection,* OKLAHOMA CITY FREE PRESS, (September 7, 2023). https://freepressokc.com/oklahoma-county-jail-flunks-surprise-july-health-inspection/

8

EXHIBIT 2

35.    A female paramedic tells Luis that she's going to check his blood sugar and Luis can only nod his head in agreement.

36.    Luis mentions that he recently got out of the hospital and is on antibiotics for a kidney disease.

37.    At 5:27 p.m. a male EMSA paramedic says aloud, after performing a finger-stick, that the blood sugar of Luis is at 423.

38.    The male paramedic and ask Luis if he takes insulin. Luis confirms that he does.

- **SUNDAY, DECEMBER 11, 2022 - BODY CAMERA OF OFFICER ENGLISH**

39.    At 5:28 p.m. and consistent with the narrative of Officer English,[15] while outside the Jail, officers remove Luis from the vehicle and place him on a cot to be examined by EMSA personnel.

40.    A female EMSA paramedic says aloud that the blood sugar of Luis is 423.

41.    She ask Luis what his blood sugar is normally and Luis says between 70 to 80; Luis adds that he works out every day.

42.    A discussion takes place about transporting Luis to a hospital and it is determined that Officer English will transport him to St. Anthony Hospital.  Luis starts crying.

43.    At 5:32 p.m. Officer English has Luis back in the vehicle and is in transport to St. Anthony Hospital.

- **SUNDAY, DECEMBER 11, 2022 - ST. ANTHONY HOSPITAL - EMERGENCY ROOM**

44.    The St. Anthony Hospital medical records confirm that Luis arrives at the emergency room by police escort at 5:42 p.m. on December 11, 2022.

---

[15] *See* Incident Report, Narrative Information, at page 7.

EXHIBIT 2

45.     The St. Anthony Hospital medical records state that the acuity level of Luis was determined to be urgent and in need of quick attention.

46.     The records also reference that paramedics found his finger-stick blood sugar to be over 400 and that Luis requires medical clearance before being booked in the Oklahoma County Jail.

47.     The past history of Luis is confirmed that Luis suffers from Type 1 diabetes.[16]

48.     The St. Anthony records also confirmed that Luis also has medical and mental conditions of bipolar disorder, anxiety disorder, and hypertension.[17]

49.     The records also past episodes of DKA.[18]

50.     Luis tells the medical staff at St. Anthony that he feels dehydrated.[19]

51.     The "Clinical Impression" of the medical staff at St. Anthony Hospital was that Luis has "Acute Kidney Injury"[20] and "Hypoglycemia".[21]

---

[16] Type 1 diabetes is an autoimmune disease that occurs when the body's immune system destroys the cells in the pancreas that produce insulin. Without insulin, blood sugar can't enter cells and builds up in the bloodstream, which can lead to serious health problems.

[17] Hypertension and diabetes are closely linked conditions that can have serious consequences if left untreated.

[18] Diabetic Ketoacidosis, or "DKA". DKA is a life-threatening complication of diabetes that occurs when one's body produces high levels of blood acids called ketones.

[19] People with Type 1 diabetes are more prone to dehydration than others because of the way the disease affects the body.

[20] Acute kidney injury (AKI) is a common complication of diabetes and can lead to serious health consequences. People with diabetes are more likely to develop AKI, and the outlook is worse for those who do. AKI can lead to faster progression of kidney disease, end-stage renal disease, and higher risk of cardiovascular and cerebral events.

[21] Hypoglycemia, or low blood sugar, is a common complication of diabetes, especially Type 1 diabetes. It occurs when blood sugar levels drop too low, and can be life-threatening if left untreated. Confusion, unusual behavior, loss of coordination, difficulty speaking, blurry vision,

EXHIBIT 2

52.     At St. Anthony Hospital, Luis Alberto Gonzalez, Jr. was given ten (10) units of insulin and two (2) liters of normal saline to raise his blood sugar and stabilize him.

53.     After Luis had been stabilized he was medically cleared for incarceration and placed back into police custody with instructions to be returned to St. Anthony Hospital if his condition worsened.

54.     Luis was discharged from St. Anthony Hospital on Sunday, December 11, 2022, at 7:22 p.m.

- **SUNDAY, DECEMBER 11, 2022 - BODY CAMERA OF OFFICER ENGLISH**

55.     At 8:20 p.m. on December 11, 2022, Luis is with Officer English for booking at the Oklahoma County Jail.  Luis talks about how tired he is.

56.     Luis is smiling, talking, and acting normal.

57.     Officer English tells an Oklahoma County Detention Officer that they were at the hospital for three hours because Luis's blood sugar was too high.

58.     Luis says, *"that's the reason I'm here…sorry about that – y'all saved my life."*

59.     In booking while taking Luis's vitals, Luis ask who will be providing medical services and the Jail Staff replies, *"Turn Key."*

60.     Several male and female Jail Staff are present, joking and laughing with each other and with Luis.

61.     Luis informs the Jail Staff that he has high blood pressure and diabetes.

62.     When the Oklahoma County Detention Center staff ask if he is suicidal, Luis responds, *"No. I just got out of the hospital and almost died, but no"*.

---

inability to eat or drink, muscle weakness, drowsiness. Hypoglycemia, if untreated in a Type 1 diabetic can lead to seizures, coma, and death.

EXHIBIT 2

63.    Luis adds that he's never been arrested for a violent offense.

64.    Luis is making jokes and is being silly and appears happy.

65.    Luis is calm, relaxed, and answering all medical questions and is informing the Jail Staff of how many units of insulin he needs while in the jail.

66.    Luis also shares with the Jail Staff, during intake, the medications he needs for his bipolar disorder, his anxiety disorder, and his hypertension.

67.    A female Jail Staff member is reviewing his paperwork and ask Luis if he's been at the Oklahoma County Jail before. Luis responds, "*Yea, a lot. Too many damn times, I'm sick of it.*"[22]

68.    Another individual in scrubs performs a finger-stick prick on Luis and says that his blood sugar is now at 92.

69.    As Officer English is leaving the processing/booking area of the Oklahoma County Detention Center, Luis tells Officer English that he appreciates him taking him to the hospital and that he needed it.

70.    Officer Aaron English leaves the Oklahoma County Jail at 8:58 p.m. on Sunday, December 11, 2022.[23]

- **SUNDAY, DECEMBER 11, 2022 – OKLAHOMA COUNTY JAIL -BOOKING**

---

[22] "It was his 22nd time at the jail since 2001, records show." *See* Nolan Clay, *Oklahoma County jail has 16th inmate death of 2022,* THE OKLAHOMAN, (December 22, 2022). https://www.oklahoman.com/story/news/2022/12/22/oklahoma-county-jail-has-16th-inmate-death-of-2022-luis-alberto-gonzalez-greg-williams-stepping-down/69751516007/

[23] Despite having "had multiple interactions with Luis" this will be the last time Officer Aaron English or anyone else outside of the Oklahoma County Jail will ever see Luis Gonzalez alive again. Because in "10 days, 9 hours, and 7 minutes" the body of Alberto Luis Gonzalez will be released to the Office of the Chief Medical Examiner for autopsy by Oklahoma County Jail Detention Officer Adebola Atoki. *See* Oklahoma County Detention Center, Detailed Release Report, Alberto Luis Gonzalez.

EXHIBIT 2

71.    Luis Alberto Gonzalez, Jr. was booked into the Oklahoma County Jail on December 11, 2022 as a pretrial detainee.

72.    Luis Alberto Gonzalez was booked into the Oklahoma County Jail as Booking #140040080 and Jacket #199899216 on Sunday, December 11, 2022 at 8:49 p.m.

| Booking # | Jacket# |
|-----------|---------|
| 140040080 | 199899216 |

| | |
|---|---|
| Arresting Authority: OKLAHOMA CITY POLICE DEPT | Arrest Date/Time: 12/11/2022 16:45 |
| Arresting Officer: ENGLISH AARON | Book Date/Time: 12/11/2022 20:49 |
| County Of Charge: Oklahoma | Last Rebook Date/Time: |
| Booking Officer: Davison, Daryian | |

73.    Luis Alberto Gonzalez, Jr. was booked into the Oklahoma County Jail as an insulin-dependent diabetic who required monitoring and proper insulin injections.

74.    Severe confusion, agitation, hallucinations, and even acute psychosis would be the result of not being monitored and provided proper dosages of insulin for a Type 1 diabetic.

75.    It is deliberate indifference to fail to provide Luis Gonzalez with proper dosages of insulin and then to place Luis Gonzalez on a floor for violent inmates because of his agitiated behavior as a result of the failure of Jail Staff to provide him with proper dosages of insulin.

76.    It is deliberate indifference to fail to monitor and provide Luis Gonzalez with proper dosages of insulin for his Type 1 diabetes to the point that Luis had to seek snacks and a Coke from the Jail commissary to self-regulate and self-medicate his blood sugar.

77.    It is deliberate indifference to deny Luis Gonzalez access to the Jail's commissary in Luis's desperate attempts to self-regulate and self-medicate his own blood sugar so that he would not die as a result of the Jail Staff's failing to monitor his blood sugar and providing him with proper dosages of insulin.

13

EXHIBIT 2

78.     It is deliberate indifference for the Defendants to fail to provide Luis Gonzalez with monitoring and proper dosages of insulin, to call a physician, and/or take him to the hospital.

79.     Upon information and belief, this is the chronology of the deliberate indifference events by these Defendants after booking Luis into the Oklahoma County Jail on December 11, 2022 that resulted in the death of Luis Alberto Gonzalez, Jr. on December 21, 2022.

- **WEDNESDAY, DECEMBER 14, 2022 – OKLAHOMA COUNTY JAIL – 12TH FLOOR**

80.     On Wednesday, December 14, 2022, Detective G. Goss, of the Oklahoma City Police Department attempted to interview Luis.

81.     Detective Goss was unable to interview Luis because the Jail Staff had moved Luis to the 12th floor of the Oklahoma County Jail, "due to him being aggressive with the inmates".

82.     Because of that information, provided by the Oklahoma County Jail, Luis was not interviewed by Detective Goss "due to his propensity for violence."

83.     Detective Goss made the following report on that date:

======================================================
INTERVIEW with:  Suspect Luis Gonzalez

Jail Tracker listed AR as being moved to the 12th floor due to him being aggressive with the inmates. I did not interview him due to his propensity for violence.

======================================================

84.     Detective Goss was allowed to bypass an interview with Luis, simply because the 12th floor of the Oklahoma County Jail is known to house the most dangerous inmates.

85.     As Oklahoma County Jail Administrator Greg Williams explained to the media in 2020:

"We put our most dangerous individuals on the 12th floor, just for extra precaution. They are both very dangerous individuals," Oklahoma County Jail

14

EXHIBIT 2

Administrator Greg Williams said. "Both of these guys were maximum security."[24]

86.    Despite the Defendants knowledge that Luis Gonzalez had Type 1 diabetes, bipolar disorder, anxiety disorder, hypertension, dehydration, acute kidney injury, and hypoglycemia; the Jail Staff failed to place Luis Gonzalez on the 13th medical floor.

87.    The Jail Staff in fact moved Luis to the 12th floor from another location.  The Jail Staff placed Luis Gonzalez on the 12th floor where the murderers with "nothing to lose" are housed.[25]

88.    As a result of that move, Luis Gonzalez lost his only chance of being seen and interviewed by someone from outside of the Oklahoma County Jail.  Someone that he could report the Defendants failure to provide him the medical care that he was in need.

- SUNDAY, DECEMBER 18, 2022 – OKLAHOMA COUNTY JAIL

89.    On Sunday, December 18, 2022, Sue Gonzalez received a call from Luis, recounted in pertinent part as follows:

"He told me, 'Mom, my blood sugar was 46. They're going to kill me if you don't get some money on the books,'[26]

90.    According to Sue Gonzalez, "He wanted this money so he could buy Coke, snacks and stuff to bring his sugar up when it got low."[27]

---

[24] *See* Erin Beu, *Inmate who escaped from Oklahoma County Jail taken into custody,,* NEWS 5-KOCO, (July 31, 2020). https://www.koco.com/article/authorities-search-for-inmate-who-escaped-from-12th-floor-of-oklahoma-county-jail/33481135

[25] *Id.*

[26] *See* Katelyn Ogle, *Mother searching for answers after son dies in Oklahoma County Jail,* NEWS 4-KFOR, (January 4, 2023). https://kfor.com/news/local/mother-searching-for-answers-after-son-dies-in-oklahoma-county-jail/

[27] *Id.*

EXHIBIT 2

91.    When a person with Type 1 diabetes has low blood sugar, it is also known as hypoglycemia.  Hypoglycemia, or low blood sugar, is a common complication of diabetes, especially Type 1 diabetes. It occurs when blood sugar levels drop too low, and can be life-threatening if left untreated. Confusion, unusual behavior, loss of coordination, difficulty speaking, blurry vision, inability to eat or drink, muscle weakness, drowsiness. Hypoglycemia, if untreated in a Type 1 diabetic can lead to seizures, coma, and death. [28]

92.    Sue Gonzalez went to the Oklahoma County Jail and tried to place a $100 on her son's books so that he could purchase from the Jail commissary to buy Cokes and snacks to raise his blood sugar.

93.    Unfortunately, the machine in the lobby of the Oklahoma County Jail was not working.

- MONDAY, DECEMBER 19, 2022

94.    Monday morning, December 19, 2022, Sue Gonzalez utilizing an online service spent several hours in an effort to place $100 on her son Louie's books so that he could purchase Coke and snacks from the Oklahoma County Jail commissary to get his blood sugar up.

95.    The Oklahoma County Detention Center contracts its commissary that provides an online service for depositing of monies for an inmate at the Oklahoma County Jail.[29]

96.    At around 11:00 a.m. on Monday, December 19, 2022, Sue Gonzalez was finally able to get $100 dollars on Louie's books so that he could purchase Coke and snacks from the Oklahoma County Jail commissary to get his blood sugar up.

---

[28] Hypoglycemia was a condition that Luis Gonzalez suffered from and it was known to the Defendants.

[29] *See* Benchmark Commissary, https://www.okcountydc.net/commisary

16

EXHIBIT 2

- **TUESDAY, DECEMBER 20, 2022**

97.    On Tuesday, December 20, 2022, Luis called his mother and told her that the $100 had arrived on his books; however, the Jail had deducted $30 for "medical".

98.    Luis told his mother that the Jail Staff were denying him the opportunity to purchase his needed Coke and snacks from the commissary so that he could his blood sugar up.

- **WEDNESDAY, DECEMBER 21, 2022 – OKLAHOMA COUNTY JAIL - DEATH**

99.    On Wednesday, December 21, 2022, Luis Alberto Gonzalez, Jr., was found dead in his cell at the Oklahoma County Detention Center.

100.    "By Wednesday, he had never got to spend a dime," said Sue Gonzalez.[30]

101.    According to a short news release by the Oklahoma County Jail, "Jail staff were sent to the medical floor to check the welfare of 39-year-old Luis Gonzalez. Once they arrived they found that he was 'not responsive'…Detention officers then attempted life-saving measures until Oklahoma City Fire Department firefighters arrived.  Firefighters pronounced Gonzalez dead at 9:58 p.m."[31]

- **THURSDAY, DECEMBER 22, 2022 – OKLAHOMA COUNTY JAIL – FINAL RELEASED**

102.    The Oklahoma County Detention Center on a single page entitled a "Detailed Release Report" made a "Final Released" report.

103.    According to the release report, Luis had been inside the Oklahoma County Jail for 10 days, 19 hours, and 7 minutes, when his body was released on Thursday, December 22, 2022 at 3:55 p.m.

---

[30] *Id.*

[31] *See* Brett Dickerson, *Detainee death reported at Oklahoma County Jail – 16th detainee death of 2022,* OKLAHOMA CITY FREE PRESS, (December 22, 2022).
https://freepressokc.com/detainee-death-reported-at-oklahoma-county-jail/

EXHIBIT 2

Admin Release Officer: Atoki, Adebola                    Release To: DECEASED
Phys. Release Officer: Atoki, Adebola                    Release Code: DECEASED
Time Served: 10 days, 19 hrs, 7 min            Release Date/Time: 12/22/2022 15:55
Reason For Release: OFFENDER PRONOUCED DECEASED ON 12/21/22 AT 2158. LT. ATOKI

104.    Under the photo of Luis Alberto Gonzalez it states only: "Final Released":

> **FINAL RELEASED**

- **THURSDAY, DECEMBER 22, 2022 – OFFICE OF THE CHIEF MEDICAL EXAMINER**

105.    According to the Report of Investigation by Medical Examiner, Marc Harrison, M.D. it was Shawn Dodson *a/k/a* Tommy Shawn Dodson, Special Investigator at the Oklahoma County Detention Center, who notified the Medical Examiner of the death Luis Alberto Gonzalez at 12:07 a.m. on Thursday, December 22, 2022.

106.    Despite the "Detailed Release Report" stating that the body of Luis was released from the Jail on Thursday, December 22, 2022 at 3:55 p.m., the Medical Examiner's Report contradicts that time and records the time that the body of Luis Gonzalez was viewed by the Medical Examiner in the Autopsy Suite as 10:00 a.m. on Thursday, December 22, 2022.

107.    The Office of the Chief Medical Examiner performed an autopsy. The Medical Examiner found no alcohol and no drugs in his system.

108.    The Medical Examiner noted that the body of Mr. Gonzalez was ***"unclothed"*** with ***"no fatal trauma"*** and the ***"body [was] smeared with apparent feces"***:[32]

> Significant observations and injury documentations - (Please use space below)
> UNCLOTHED ADULT HISPANIC MALE WITH NO FATAL TRAUMA.
> BODY SMEARED WITH APPARENT FECES.

---

[32] It is inexplicable why the body of Luis was naked and smeared with feces. However, upon information and belief, Oklahoma County Jail inmates who are placed in a suicide prevention (SP-1) cell have all their clothing removed and also denied access to Jail commissary.

18

EXHIBIT 2

109.    The Medical Examiner determined that the probable cause of the death of Luis Alberto Gonzalez was "DIABETES MELLITUS, SEQUELAE":

### Probable Cause of Death:
### DIABETES MELLITUS, SEQUELAE

- **THE UNNECESSARY DEATH OF LUIS GONZALEZ**

110.    Luis Alberto Gonzalez, Jr. was just 39 years old and he was dead.

111.    Luis Alberto Gonzalez lived 39 years with his diabetes and he died after only 10 days at the Oklahoma County Detention Center.

112.    Luis Gonzalez died as a result of Defendants' deliberate, callous indifference.

113.    Luis Gonzalez was clearly in such a condition that even a lay person would easily recognize his need for medical attention. Yet Jail Staff never took *any* reasonable measures to abate the risk to Luis Gonzalez's health.

114.    Defendants also failed to refer Luis Gonzalez to medical personnel capable of treating his condition. If the Jail *had* provided Luis Gonzalez with competent medical care, a competent medical provider would have mandated that Luis Gonzalez receive immediate medical treatment for his diabetic condition. And Luis would likely still be here today.

115.    Despite clear warnings and directives, upon information and belief, Luis Gonzalez was not monitored closely at the Jail. Rather, consistent with the longstanding policy, practice and custom of understaffing the Jail and failing to provide a constitutionally adequate level of supervision to ensure inmate safety, Luis Gonzalez was mostly ignored by facility staff.

116.    Upon information and belief, multiple disturbing failures to supervise, monitor, assess and assist Luis Gonzalez occurred prior to his death that are consistent with the long-standing failure to adequately staff and supervise the Jail.

19

EXHIBIT 2

117.    Upon information and belief, there was wholly inadequate staffing at the Jail at the time of Luis Gonzalez's death to reasonably ensure inmate safety.

118.    Upon information and belief, Jail Staff failed to reasonably check on Luis Gonzalez due to the long-standing custom and practice of understaffing and overcrowding at the Jail.

119.    The Eighth Amendment and Fourteenth Amendment alike require that inmates and detainees be provided reasonably adequate conditions of confinement.

120.    Any reasonable Jail Staff employee knew or should have known those rights, at the time of the complained conduct, as they were clearly established.

121.    The failure of Jail Staff to check on and monitor the welfare of Luis Gonzalez constitutes a failure to protect  Luis Gonzalez with deliberate indifference to a serious medical need and to Luis Gonzalez's health and safety.

122.    In fact, the Jail Staff thwarted the efforts of Luis to self-medicate and self-regulate his blood sugar.

123.    As a direct proximate result of the Jail Staff's unlawful conduct, Luis Gonzalez suffered actual and severe physical injuries, physical pain and suffering and emotional and mental distress and death.

124.    With timely and appropriate monitoring, treatment, and/or response, it is more likely than not that Luis Gonzalez would have been saved.

- **THE AFTERMATH**

125.    The Oklahoma County Jail sent the entire $100 back to Sue Gonzalez without the $30 deduction for "medical".

126.    The death of Luis Gonzalez came one week after Brandi Garner was named Interim Oklahoma County Jail CEO:

20

EXHIBIT 2

> Garner has plenty of things on her to-do list these days. Perhaps most important is reducing detainee deaths. One detainee, Luis Gonzalez, died about one week after Garner took over. She said the jail's troubling track record weighs on her every time she enters its doors, and the concerns about safety linger long after she leaves.[33]

127.     Brandi Garner is presently the Chief Executive Officer of the Oklahoma County Detention Center and countenances herself "as the visionary leader of the Oklahoma County Criminal Justice Authority."[34]

128.     However, Brandi Garner previously worked as a mere administrator at the Cleveland County Jail before becoming security director at the Oklahoma County jail in January 2022.[35]

129.     Most importantly, Brandi Garner was an administrator at the Cleveland County Jail wherein a lengthy list of atrocities involving Turn Key and Jail Staff have occurred. *See* Paragraphs 196-199, 208, 227, 228, 243, 304, 305, and 307, *infra*.

130.     Although the Oklahoma County Detention Center publicly stated that the Luis Gonzalez death is under investigation and that the Oklahoma State Bureau of Investigation ("OSBI") and the Oklahoma District Attorney's Office had been notified of the death of Luis Gonzalez, no results of any investigation has made public or been provided to the Plaintiff.

---

[33] *See* Matt Patterson, *Interim Oklahoma County Jail CEO Brandi Garner strives to be "more communicative"*, NONDOC, (January 23, 2023). https://nondoc.com/2023/01/23/interim-oklahoma-county-jail-ceo-brandi-garner/

[34] *See* https://www.okcountydc.net/administration

[35] *See Interim Oklahoma County Jail CEO Brandi Garner strives to be "more communicative"*, *supra*.

EXHIBIT 2

**Oklahoma County/OCCJA/ BOCC Policy and Custom of Deliberate Indifference**

131.    Plaintiff incorporates all previous allegations and statements as if fully restated herein.

132.    There is an affirmative link between the aforementioned unconstitutional acts and/or omissions and policies, practices and/or customs which Oklahoma County/OCCJA/BOCC promulgated, created, implemented and/or possessed responsibility for.

133.    To the extent that no single officer violated Luis Gonzalez's constitutional rights, Oklahoma County/OCCJA/BOCC are still liable under a theory of a systemic failure of Oklahoma County/OCCJA/BOCC policies and procedures as described below. There were such gross deficiencies in staffing, facilities and procedures that Luis Gonzalez was effectively denied constitutional conditions of confinement.

134.    Publicly available information reveals that from its inception in 1991, the Jail has been systemically deficient. Overcrowding, under staffing, inadequate security and supervision have been constant.

135.    Following a lengthy investigation, in 2008, the U.S. Department of Justice issued a report on conditions of confinement at the Jail. The DOJ found woefully inadequate supervision and staffing at the Jail, a lack of basic medical and mental health care, overcrowding and a high rate of inmate assaults and deaths.

136.    Upon information and belief, a copy of this DOJ Report was sent to Defendant Oklahoma County or Jail Trust, in their official capacity by sending it to John Whetsel, Oklahoma County Sheriff in 2008, as well as the Oklahoma County District Attorney and the United States Attorney for the Western District of Oklahoma. As such, Defendants BOCC and Jail Trust were on notice and aware of the constitutional deficiencies addressed by the DOJ Report.

EXHIBIT 2

137.    In 2013, the Tenth Circuit Court of Appeals held that Oklahoma County was not entitled to summary judgment in a Jail suicide case involving an inmate named "Holdstock". *See Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 512 F. App'x 861, 872 (10th Cir. 2013). In so holding, the *Layton* Court relied on the DOJ Report and reports from Oklahoma State Department of Health ("OSDH"), as follows:

> The DOJ Report—the product of four separate inspections of the jail—concluded that "certain conditions at the Jail violate the constitutional rights of detainees confined there." Aplt. App., Vol. I, at 155 (DOJ Investigation of the Okla. Cnty. Jail, dated July 31, 2008). The report stated that four years had passed between the DOJ's first three tours of the jail and its most recent one, but "[d]espite this opportunity to improve conditions at the Jail, ... [the DOJ] did not observe improved conditions." *Id.* at 154.

> More specifically, the DOJ report stated that *"actual direct supervision of detainees at the Jail is virtually non-existent [and the] facility is not adequately staffed to maintain necessary supervision of detainees to secure their safety." Id.* at 157. It further found that: (1) *conditions at the jail make it "difficult, if not impossible, for detention staff to be able to provide adequate safety and security checks of the detainees," Id.* at 158; (2) the crowded conditions "tax numerous areas of Jail operations and create circumstances that contribute to unconstitutional conditions," *Id.* at 157 n. 4; (3) *"detention officers have little time to actually monitor detainees [and] detainees are often left unsupervised for extended periods of time," Id.* at 158; (4) while surveillance cameras have been installed in many areas of the jail, *"blind spots exist* within the housing units, *such as in ... the inside of the cells, which cannot be monitored with cameras," Id.*; and (5) "[c]ompounding the lack of adequate detainee supervision within the housing units is limited visibility into the individual cells," *Id.*

> During the DOJ's tours of the jail, they "uncovered instances where detainees were not provided access to medical care, specifically acute services—with dire results." *Id.* at 166. While the jail has a "sick call system for detainees to access routine medical care services, detainees' serious medical needs are not adequately met." *Id.* (emphasis added). Again, noting problems with nonroutine care, the report included the finding that the jail *"has had some problems providing appropriate access to medical care during emergencies." Id.* at 167. The report described an incident where the medical care that the jail furnished to a detainee was, in the DOJ's opinion, "'unconscionable' during the hours she was in critical need of access to medical care." *Id.*

EXHIBIT 2

The report outlined several recommended remedial measures, which, in the DOJ's view, should "at a minimum" be implemented "to address the constitutional deficiencies identified ... and protect the constitutional rights of detainees." *Id.* at 173. Among these, the ***DOJ recommended that the jail "implement policies and procedures to allow adequate supervision of detainees. This should include[ ] conducting adequate staff rounds ... and promptly responding to medical or other emergencies."*** *Id.* Within a general admonishment to "ensure the timely assessment, identification and treatment of detainees' medical ... needs," the report outlined a need to "[p]rovide timely and appropriate treatment for detainees with serious medical ... conditions," and provided that "detainees with chronic diseases [should] receive screening, testing, treatment, and continuity of care," and that the jail should "[p]rovide medications ... in a timely manner." *Id.* at 174. Further, according to the DOJ, the jail should "[p]rovide medical and mental health staffing sufficient to meet detainees' serious medical and mental health needs ... includ[ing] staffing to provide timely ... medical care." *Id.* at 175.

*Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 512 F. App'x 861, 864–65 (10th Cir. 2013) (emphasis added).

138.    Ultimately, the *Layton* Court held and found that "a reasonable jury could find that the County and [the Oklahoma County Sheriff] were on notice as to the problems with the jail's medical-care system, and that had they taken any number of possible remedial actions—many of which were explicitly identified by the DOJ and OSDH—Mr. Holdstock's condition would not have deteriorated and his death could have been avoided by timely medical intervention." *Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 512 F. App'x 861, 872 (10th Cir. 2013).

139.    It is clear that systemic deficiencies identified by DOJ and the *Layton* Court -- including understaffing and other conditions at the Jail that make it "difficult, if not impossible, for detention staff to be able to provide adequate safety and security checks of the detainees" – were never reasonably addressed by the County or the Jail Trust and persisted and continued through February of 2022.

24

EXHIBIT 2

140.    Since 2008, the Department of Justice has been identifying deficiencies at the Oklahoma County Detention Center ("OCDC") including: (a) overcrowding; (b) physical layout of the facility prohibiting adequate sight and sound supervision; (c) an inordinately high risk of violence due to inability to properly supervise; and (d) inadequate staffing numbers.

141.    In 2012, the DOJ cited that the OCDC was still short-staffed and compromising inmate health and safety.

142.    From at least 2008 to present, BOCC has failed to provide sufficient oversight and funding of the Jail. Due to the documented dangers at the Jail, including DOJ's finding of inadequate supervision and staffing and a high rate of inmate deaths, in 2009, BOCC entered into a Memorandum of Understanding with the federal government. Under this Memorandum of Understanding, Oklahoma County was to adequately fund and staff the jail by 2014, or face court action from the federal government to force compliance.

143.    As of February 2022, Oklahoma County had plainly not complied with the requirements of Memorandum of Understanding with the Department of Justice.

144.    From at least 2008 to present, chronic shortage of detention officers and the facility's flawed design have made it impossible to adequately supervise the Jail.

145.    Documented insufficient staffing levels and the poor condition of the 30+ year-old jail building have contributed to high death rates, numerous assaults and a lack of basic rights for inmates at the Jail over the past decade.

146.    In September 2021, the Oklahoma County District Attorney petitioned the Oklahoma County District Court to convene an Oklahoma County Grand Jury to investigate, among other items, the operation of the Jail.

EXHIBIT 2

147.    Defendant OCCJA was aware of the allegations of the Petition and cooperated with the subsequent investigation by the multicounty grand jury ("MCGJ").

148.    Among the issues highlighted by the petition was a lack of physical security for both inmates and staff, and preventable loss of life within the jail since the OCCJA assumed management thereof. *See* Final Report Regarding [OCCJA] and the Administration of the Oklahoma County Detention Center, Filed in Oklahoma County Case GJ-2021-3 on Mar. 23, 2023.

149.    The MCGJ reviewed inspections of the jail performed by the Oklahoma State Department of Health and the National Institute of Corrections which identified material deficiencies – including severe understaffing – that were an ongoing issue at the jail for years prior to the death of Luis Gonzalez. *Id.*

150.    The MCGJ further received evidence that inmates "routinely" break holes in the walls of the jail and "can literally break down walls and tunnel in-between cells." *Id.*

151.    The MCGJ received evidence that 73 inmates died, or became ill and died, in the jail from the period 2000-2019, but since the OCCJA has been in place, 37 inmates have died or became ill and died in the time period July 1, 2020-March 23, 2023. *Id.*

152.    The death of Luis Gonzalez was the 16th reported death inside the Oklahoma County Jail in 2022, alone.[36]

153.    Each death in the jail is a separate, potential homicide case within the jurisdiction of the Oklahoma County District Attorney. The MCGJ received evidence that some of those cases were submitted to the District Attorney for criminal charges, while others were not. *Id.*

---

[36] *See* Nolan Clay, *Oklahoma County jail has 16th inmate death of 2022,* THE OKLAHOMAN, (December 22, 2022). https://www.oklahoman.com/story/news/2022/12/22/oklahoma-county-jail-has-16th-inmate-death-of-2022-luis-alberto-gonzalez-greg-williams-stepping-down/69751516007/

EXHIBIT 2

154.    According to the evidence as reported by the MCGJ, "three (3) major issues have led to deaths in the jail – inadequate controlled dangerous substance interdiction, inadequate health screening during the intake process, and the failure of detention officers to conduct proper site checks on inmates." *Id.*

155.    According to the evidence as reported by the MCGJ, "site checks, required under jail regulations, have not been adequate and falsified site checks have led to deaths in the jail." *Id.*

156.    The MCGJ report notes that adequate site checks would both improve inmate safety and security and would improve suicide prevention, as multiple inmates have allegedly died by hanging in the jail since 2021. *Id.*

157.    The MCGJ Final Report concludes: "The MCGJ believes that inadequate staffing, funding, surveillance, and training, coupled with poor law enforcement protocols, led to the significant loss of life within the jail." *Id.*

158.    The MCGJ also heard evidence that poor hiring practices and lack of background checks led to members of organized criminal gangs securing employment at the jail. In its report, the MCGJ stated: "It is troubling to the MCGJ that, according to testimony of witnesses, administrative staff were warned and allegedly ignored concerns by some investigative staff that criminal street gang members were being hired as detention officers." *Id.*

159.    At the time of the incident involving Luis Gonzalez, upon information and belief, the Jail employed fewer detention officers to supervise inmates, and other officers, than it did in 2008.

160.    Due to the lack of adequate staffing, overcrowding and an attitude of indifference toward inmate safety, preventable acts of violence and inmate deaths became commonplace at the Jail.

EXHIBIT 2

161.    In December of 2020, two inmates, Roy Lee Parkerson and Aaron Cooper, were violently assaulted by other inmates, in two separate incidents, while no detention officer provided any supervision or protection.

162.    Four (4) other detention officers have been charged criminally for using excessive force on inmates who left their cells to shower or use the toilet without permission.

163.    Three former detention officers faced misdemeanor charges of cruelty for placing detainees in a "standing stress position," a well-known "enhanced interrogation" or torture tactic and forcing them to listen to the children's song "Baby Shark".[37] The detention officers sometimes used the song as a form of discipline for inmates who left their cells.

164.    Due to inadequate staffing, the "Baby Shark" victims were mostly left alone in their pods. One victim was singled out for punishment after he rigged the old, faulty lock in his cell so he could walk freely around the jail pot, shower and use a toilet with more privacy than the one in his shared living area.

165.    As summarized in the Probable Cause Affidavits, the blatantly unconstitutional conduct of the "Baby Shark" officers, "Miles, Butler and Hendershott," was open, obvious and repeated. Yet, no one from Oklahoma County stepped in to take remedial action. This exemplifies a systemic and deep-seated failure to train and supervise, with respect to the most basic aspects of correctional operations and constitutional conditions of confinement. As stated in the Probable Cause Affidavits:

_____

[37] Though these incidents occurred in 2019, when the Sheriff's Office operated the Jail, the Jail Trust is the successor entity for the purposes of municipal liability and the BOCC has remained responsible for the Jail during all pertinent time periods.

EXHIBIT 2

Upon interviewing DO Miles, he confirmed that he and Butler systematically worked together and used the benches, bars and attorney booth as a means to discipline inmates and teach them a lesson because they felt that disciplinary action within the Detention Center was not working in correcting the behavior of the inmates. Butler also confirmed that he used the booth as a means of punishment. Miles further stated that the inmates often 'pissed off' Butler which evidence suggests led to those inmates being taken out of their cells/pods and mistreated. The secure point on the wall was measured as being 3ft from the floor up the wall. At this height and with no chair to sit on, it would have been nearly impossible for most inmates to sit or kneel thus forcing them to stand.

Statements made by inmates and staff also indicated that in addition to the corporal punishment given by Miles and Butler, they additionally worked together and played children's music on a loop to play repetitively aloud while the inmates were housed in the attorney visitation booth thus putting undue emotional stress on the inmates who were most likely already suffering from physical stressors. The playing of the music was said to be a joke between Miles and Butler as confirmed by Miles.

Additional evidence showed that Detention Officers Miles and Butler worked under their direct supervisor, Lt. Hendershott, who *failed to properly supervise and discipline* them. Miles and Butler were the subject of numerous inmate complaints that detailed their *history of mistreatment of inmates* ranging from retaliation to mishandling of inmate mail. In addition, nearly *20 handwritten inmate complaints* were received at one time regarding one or both Officers and directly forwarded to their supervisor, Lt. Hendershott. Evidence suggests that no investigation was conducted and subsequently no corrective action was taken by their direct supervisor, Lt. Hendershott. Evidence also showed that when Hendershott first learned of inmate mistreatment by Miles and Butler on 11-23-19, he took no immediate action to either aid the inmate victim or discipline the Officers. *This appeared to have led to the Officers continuing to mistreat inmates where at least an additional six (6) inmates were physically victimized.*

166.    Another inmate, Charlton Chrisman, died in 2017, after he was shot at close range more than a dozen times with pepper balls by detention officers at the Jail. His family filed a federal civil rights lawsuit. BOCC recently approved a $1.1 million settlement of that lawsuit.

167.    On January 2, 2021, another inmate, Brad Lane, was violently and loudly assaulted and bludgeoned by his cell mate for 40 minutes before any officer showed up. There was no officer monitoring because of the short staffing. By the time detention staff arrived on the floor, Lane was

EXHIBIT 2

already dead. Mr. Lane's death, like the death of Luis Gonzalez, resulted from grossly deficient staffing, supervision and/or security.

168.    The Jail Trust retained consultant David Parker to provide recommendations to remedy the continuing deficiencies at the Jail. Upon information and belief, Parker issued a report finding outdated training and policies and procedures, a staff consensus is that "every issue that transpires in the jail can be traced to staff shortages," and staff being trained to detect and/or intervene in inmate incidents appropriately.

169.    In May 2021, the National Institute of Corrections provided a report to the BOCC and Jail Trust finding: (a) an incomplete staffing plan; (b) that new hires receive limited training; (c) "[c]lear and convincing present level of staffing was insufficient for a safe and secure jail"; (d) it was "[i]mpossible to effectively manage inmate population when they are so short-staffed;" (e) that officers were coming to work without proper training; and f. a lack of policies and procedures posted.

170.    In October of 2021, an inmate named Ta'Vion Murphy was subjected to an inmate-on-inmate assault when another detention officer, Dominique Thomas, allowed an inmate access to Murphy for the purposes of permitting an assault of Murphy. Murphy was subsequently stabbed nearly 30 times.

171.    Defendants BOCC and Jail Trust have been deliberately indifferent to the DOJ's reports, the *Layton* decision, and other clear evidence, warning that short staffing and overcrowding would continue to lead to violence and deaths, in violation all detainees' constitutional rights.

172.    Numerous news and internet articles also made Defendants BOCC and Jail Trust aware well prior to February 2022, of the unreasonable conditions at the Jail, for example, Business

EXHIBIT 2

Insider reported that "Over the past 15 years, the 13-story jail, in Oklahoma City has had many alleged problems, from unsanitary conditions to negligent care of inmates, poor medical care, and outright abuse of inmates. A clerical worker at the Jail posted a YouTube video claiming inmates had been beaten right in front of her." (BUSINESS INSIDER, *The stories coming out of this Oklahoma jail are horrifying*, February 25, 2015).

173.    Oklahoma County/OCCJA plainly failed to adequately train and supervise its officers, in violation of County policies and the Oklahoma Jail Standards, including Jail Staff, with respect to, inter alia: supervision of inmates, protection of inmates, emergency medical care, adequate medical care for injured inmates, cruel or inhumane corrections practices and constitutional requirements for the conditions of confinement.

174.    In finding constitutional liability at the county level, the Tenth Circuit, in *Tafoya v. Salazar*, 516 F.3d 912, 919 (10th Cir. 2008), pointed to evidence of an "undisciplined culture of 'anything-goes' among the detention officers [that] remained unaddressed and unmitigated by Sheriff Salazar, who continued to employ a hands-off approach to jail management." Here, as discussed throughout, the County's/Jail Trust's "management style" has been "hands-off" at best and describing the culture at the Jail as "undisciplined" and "anything goes" would be charitable.

175.    The County/BOCC/Jail Trust have had abundant opportunity to increase funding, supervision and training which would allow it to properly staff and address the systemic deficiencies that have plagued the Jail for well over 10 years. Its failure to do so has resulted in injury to multiple detainees, including Luis Gonzalez. The failure to take reasonable measures to alleviate known and substantial risks to inmates like Luis Gonzalez constitutes deliberate indifference at the municipal level.

EXHIBIT 2

**Oklahoma County/OCCJA/BOCC and Turn Key's Policy and Custom of Inadequate
Medical Care and Deliberate Indifference**

176.    All preceding paragraphs are incorporated herein by reference.

177.    It is believed that Defendant Turn Key is the largest private medical care provider
to county jails in the state. Turn Key used its political connections to obtain contracts in a number
of counties, including Cleveland County, Creek County, Garfield County, Muskogee County,
Oklahoma County, Ottawa County, Pottawatomie County and Tulsa County.

178.    Turn Key has demonstrated, over a period of years, that its medical delivery system
and "plan" is dangerously deficient. At least by the time of Luis Gonzalez's death, Oklahoma
County/OCCJA/BOCC knew, or should have known, that Turn Key's grossly deficient system and
"plan" posed excessive risks to the health and safety of inmates, like Luis Gonzalez, who suffer
from serious and complex medical conditions.

179.    To achieve net profits, Turn Key implemented policies, procedures, customs, or
practices to reduce the cost of providing medical and mental health care service in a manner that
would maintain or increase its profit margin.

180.    Under the Contract in effect while Luis Gonzalez was housed at the Jail, Turn Key
was responsible to pay the costs of all pharmaceuticals at the Jail up to just $40,000 per year (both
prescription and over-the-counter). If the annual pharmaceutical costs exceeded this limit,
Oklahoma County/OCCJA/BOCC was responsible for the excess costs.

181.    Similarly, Turn Key was responsible to pay the costs for all off-site medical
services and hospitalizations up to just $50,000 per year, and Oklahoma County/OCCJA/BOCC
was responsible for any excess costs of inmate hospitalizations and off-site medical care.

EXHIBIT 2

182.    The Contract provided that Turn Key will arrange and bear the cost of hospitalization of inmates who – in the opinion of the Turn Key treating physician or medical director, require hospitalization – up to the agreed-upon limit.

183.    These contractual provisions create a dual financial incentive to under- prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail and to avoid off-site medical costs.

184.    These financial incentives create risks to the health and safety of inmates like Luis Gonzalez who have complex and serious medical and mental health needs, such as Type 1 diabetes, bipolar disorder, anxiety disorder, hypertension, dehydration, acute kidney injury, and hypoglycemia.

185.    Turn Key provides inadequate guidance, training and supervision to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical and/or mental health needs.

186.    Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

187.    These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical needs, such as Type 1 diabetes, bipolar disorder, anxiety disorder, hypertension, dehydration, acute kidney injury, and hypoglycemia.

EXHIBIT 2

188.    Decisions related to the assessment and treatment of Luis Gonzalez were largely made by LPNs and LPCs who failed to refer Luis Gonzalez to a physician or offsite medical provider for a medical assessment.

189.    LPNs and LPCs are not trained, licensed or legally permitted to diagnose any medical condition. LPNs and LPCs cannot prescribe medication. LPNs cannot practice without the direct supervision of a physician or RN. Yet, under Turn Key and Oklahoma County/OCCJA/BOCC's medical delivery system, these providers are permitted to assess, evaluate and treat detainees with complex and serious medical and mental health conditions, without direct supervision by a physician or RN. This "system" violates Oklahoma law and, by design, creates excessive and unreasonable risks to inmates and detainees, like Luis Gonzalez, who have serious, complex and/or life-threatening conditions.

190.    Consistent with the dangerously deficient medical delivery system, upon information and belief, Luis Gonzalez was never medically assessed by a physician, PA, NP, or even RN.

191.    Luis Gonzalez was also not provided with any of the necessary medications to address his obviously serious medical conditions and was left to his own devices to self-medicate and self-regulate his blood sugar. An effort that was thwarted by his denial to attain commissary.

192.    Additionally, Turn Key has an established practice of failing to adequately assess inmates with complex and serious medical and mental health needs, including a failure to regularly take vital signs and blood sugar readings.

193.    Even on the rare occasions Turn Key staff takes vital signs and/or blood sugar readings from inmates with complex and serious medical and mental health needs, like Luis Gonzalez, Turn Key has an established practice of failing to train medical and mental health staff on what constitutes

34

EXHIBIT 2

alarming vital signs and/or blood sugar readings; when to report alarming vital signs and/or blood

sugar readings to a physician; and failing to send inmates with complex and serious medical and

mental health needs to an outside medical facility for an adequate assessment and treatment.

194.    Turn Key's inadequate or non-existent policies and customs were a moving force

behind the constitutional violations and injuries alleged herein.

195.    Turn Key's corporate policies, practices, and customs, as described *supra*, have

resulted in deaths or negative medical outcomes in numerous cases, in addition to Luis Gonzalez.

196.    Fore example, in November 2014, while detained at the Cleveland County Jail,

Robert Allen Autry developed a sinus infection. Both he and his mother informed Turn Key

medical staff that a traumatic brain injury he suffered as a teenager made him particularly

susceptible to sinus infections causing life threatening brain injections. Mr. Autry and his mother

repeatedly asked medical staff to provide antibiotics, but none were provided.

197.    Approximately two weeks after she initially contacted medical staff about his son's

condition and need for care, Turn Key staff called Mr. Autry's mother asking her to provide written

consent for Mr. Autry to receive emergency surgery.

198.    He had been found unconscious in his cell and had been transported to the hospital.

Later the same day, Mr. Autry was diagnosed with "a serious bacterial infection in his brain as a

result of an untreated sinus infection." Mr. Autry underwent emergency brain surgery and

subsequently a serious of operations and procedures to place a feeding tube, insert a tracheal tube,

and replace a cranial monitoring probe.

199.    Eventually, the treating physician determined Mr. Autry "was totally incapacitated

from a brain injury resulting from a brain abscess and subdural empyema" and "would likely never

return to an independent state."

35

EXHIBIT 2

200.   In June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair.

201.   On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

202.   An El Reno man died in 2016 after being found naked, unconscious and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

203.   Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told

36

EXHIBIT 2

him he was faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He was forced to lay in his own urine and feces because staff told Smith he was faking paralysis and refused to help him.

204.    In November of 2016, Turn Key staff disregarded, for days, the complaints and medical history of James Douglas Buchanan while he was an inmate in the Muskogee County Jail. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … *He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection* in result of his critical illness [and] hospitalization, but then *while in <u>jail</u>, he deteriorated significantly and his <u>clinical</u> <u>deterioration</u> <u>went</u> <u>unrecognized</u> <u>and</u> <u>untreated</u> until he was nearly completely quadriplegic.*

205.    On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

206.    Like Luis Gonzalez, Mr. Lee was largely assessed and treated by LPNs during his nearly three-week incarceration at the Jail before his death.

EXHIBIT 2

207.    Indeed, a physician never once saw Mr. Lee for a week before his death, despite the fact that his symptoms and conditions, including hypertension, bipolar disorder, and hallucinations, continued to deteriorate.

208.    In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell while he died within hours. Cleveland County Jail detention staff were aware of the same symptoms and performed wholly inadequate, less than one second long sight checks of Mr. Kessee throughout the last hours of his life. Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

209.    On September 6, 2019, Dunniven Phelps was booked in to the Tulsa County Jail.

210.    During the book-in process, on September 6 at approximately 7:35 p.m., Turn Key employee/agent Richard Dutra filled out an Intake Screening form. Pertinently, the Intake Screening form indicates that Mr. Phelps was being treated for hypertension (high blood pressure) at the time and had been prescribed medication by his physician to treat the condition. During the intake screening process, Mr. Dutra further documented that Mr. Phelps was diabetic and had previously been diagnosed with mental health conditions.

211.    During the medical intake process, Mr. Phelps complained that he had a severe headache, neck pain, and burry vision, which are common symptoms of a stroke.

212.    Despite the fact that Mr. Phelps told Mr. Dutra about his current symptoms and history of hypertension, Mr. Dutra recommended that Mr. Phelps be placed in general population and that he did not need a referral for a continuity of care plan.

38

EXHIBIT 2

213.    Throughout the night of September 6, 2019, Mr. Phelps' symptoms significantly worsened, as he was obviously suffering from a stroke.

214.    At approximately 9:37 a.m. on September 7, Turn Key Nurse Patty Buchanan "assessed" Mr. Phelps, who told her that he could hardly feel or move the left side of his body and his other symptoms, such as dizziness and blurred vision, were worsening. Nurse Buchanan recorded Mr. Phelps' blood pressure as 163/103, which the American Heart Association classifies as Stage 2 hypertension.

215.    Nurse Buchanan failed to inform a physician or even an RN or Nurse Practitioner about Mr. Phelps' alarming symptoms and worsening condition, in deliberate indifference to his serious medical needs.

216.    Further, while Nurse Buchanan allegedly counseled Mr. Phelps on the importance of taking his medications, there is no evidence that she, or anyone else at TCSO/Turn Key, *ever gave Mr. Phelps any medications during his time at the Jail.*

217.    On one occasion, when Mr. Phelps could not get off of the ground because he could not use his left leg or left arm, a DO threatened to "Taze" Mr. Phelps if he didn't get off the ground.

218.    Mercifully, an inmate who was an amputee let Mr. Phelps use his wheelchair so that he could try to get an actual medical assessment and treatment at the medical unit of the Jail.

219.    At approximately 2:19 p.m. on September 7, a DO finally agreed to wheel Mr. Phelps to the medical unit, while he was seen by Nurse Gann.

220.    Shockingly, Nurse Gann thought Mr. Phelps was faking his emergent condition. Jail surveillance video shows Mr. Phelps lying on the ground in the medical unit, unable to walk, stand, or effectively use his arms, while Nurse Gann drops a piece of paper onto his face, presumably because she thought Mr. Phelps would move out of the way if he was capable of

EXHIBIT 2

moving. Nurse Gann and other Turn Key personnel left Mr. Phelps lying on the floor, helpless and in immeasurable pain.

221.    At 4:05 p.m. on September 7, Mr. Phelps was finally seen by Elizabeth Martin, Advanced Practical Registered Nurse ("APRN").

222.    APRN Martin noted that Plaintiff had a *"3 day history of evolving stroke like symptoms."* She also noted that Plaintiff's "speech [was] slurred" and that he had "left side facial droop" and weakness on his left side. By this time, Plaintiff's blood pressure was 183/114, which is considered a *hypertensive crisis that requires immediate consultation and assessment by a physician.*

223.    Mr. Phelps was finally sent to Hillcrest Medical Center at approximately 6:15 p.m. on September 7, 2019.

224.    Once at Hillcrest, Mr. Phelps was transferred to the Intensive Care Unit ("ICU") whose physicians provided emergent, live-saving treatment.

225.    Unfortunately, the delay in treating Mr. Phelps, due to Turn Key and Jail staff's deliberate indifference, resulted in Mr. Phelps suffering permanent damage.

226.    Mr. Phelps is now permanently paralyzed on the entire left side of his body and will require significant medical treatment for the rest of his life.

227.    From June to October 2019, Bryan Davenport, an inmate at the Cleveland County Jail, was denied adequate medical care by Turn Key personnel. Mr. Davenport informed Turn Key staff that he had hypertension and HIV, yet he was not seen by a physician, physician's assistant, or nurse practitioner for nearly a month after his arrival at the jail. Davenport provided Turn Key staff with the names of his providers, his need for HIV medications, and the names of those medications. When a Turn Key nurse finally saw Davenport, she told him that she did not want to

EXHIBIT 2

start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring him to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15/visit.

228.    In October-November 2020, an inmate at the Cleveland County Jail slowly died of his known congestive heart failure as Turn Key and its employees ignored the obvious and severe worsening of his condition, including extreme edema and swelling, fluid leaking from his legs, urinary incontinence, and clear sings of infection. Turn Key staff failed to properly assess, evaluate, or treat the inmate and failed to refer him to a more highly trained provider or an outside medical provider.

229.    In July 2021, an inmate named Perish White died of COVID-19, which he contracted in the Creek County Jail.

230.    Mr. White began feeling ill on or about July 5, 2021, and reported his symptoms to Turn Key staff at the Creek County Jail.

231.    By July 8, 2021, at the latest, Mr. White began experiencing shortness of breath and coughing. On information and belief, Mr. White also stopped eating and was refusing meal trays. These drastic changes in Perish White's condition, particularly in light of the ongoing COVID-19 pandemic, made it obvious, even to a layperson, that Perish needed emergent evaluation and treatment from a physician.

232.    ***From July 5 to July 16, 2021, Turn Key staff never once took Mr. White's vital signs,*** despite his repeated complaints that he was seriously ill, his obvious symptoms, and the fact that COVID-19 was raging through the Creek County Jail.

EXHIBIT 2

233.    On July 19, 2021, Mr. White was finally taken to OSU Medical Center in Tulsa for COVID-19 and respiratory failure. At the time, his oxygen saturation level was in the 70's. He was diagnosed with acute kidney failure. He was placed on life support, including a ventilator and dialysis.

234.    Mr. White died on July 30, 2022.

235.    April 13, 2021, Christa Sullivan died at the Oklahoma County Jail ("OCJ"), which also uses Turn Key as its jail medical provider.

236.    Ms. Sullivan had a history of severe mental illness, including depression, bipolar disorder, schizophrenia, and several previous suicide attempts.

237.    Ms. Sullivan was housed at the OCJ for nearly a year prior to her death. Throughout her time at OCJ, she exhibited extremely serious symptoms, including multiple instances of self-harm, suicidal ideation, a refusal to eat or drink, rapid weight loss, and catatonia.

238.    Approximately two months before Ms. Sullivan's death, numerous Turn Key providers, including nurses and two physicians, acknowledged Ms. Sullivan's emergent conditions and the fact that it was impossible for Ms. Sullivan to receive the life-saving care she needed in a jail setting.

239.    In fact, one Turn Key physician noted, with respect to Ms. Sullivan:

> DEPRESSED AFFECT, SEVERE ADULT FAILURE TO THRIVE. SEEMS AT HIGH RISK FOR POOR OUTCOME. I HAVE DISCUSSED HIS CASE WITH PSYCHE, NURSING, AND WOUND CARE AND DO NOT SEE ANY LIKELY TO SUCCEED INTERVENTIONS IN THIS SETTING. SHE DOES NOT SEEM COMPETENT BY ANY BEHAVIORAL PARAMETER THAT I CAN SEE. WILL REDISCUSS OPTIONS WITH DR. CUKA AND DR. COOPER.

240.    Yet, Turn Key providers allowed Ms. Sullivan to languish in her cell for months, cationic and barely eating, until her eventual death.

EXHIBIT 2

241.    After Ms. Sullivan's death, Kevin Wagner, a Captain at OCJ told an investigator, "[Ms. Sullivan] went from 148 when she got here to … *she looks like a skeleton."* Captain Wagner also told the investigator he helped get Ms. Sullivan to a local hospital for a week at one point "because I felt that *medical (in the Jail) wasn't providing his care enough."*

242.    Another staff member told an investigator that Ms. Sullivan deteriorated *"to a bag of bones."*

243.    On June 12, 2021, Joseph Stewart was booked into the Cleveland County Jail.

244.    On June 13, 2021, Mr. Stewart advised a Jail detention officer and Turn Key Nurse Angela Albertson, LPN, that he needed to go to the hospital because his arm had been hurting since the day of his arrest and because he had an L1 (lumbar vertebrae) fracture that was hurting.

245.    Responsible Jail and Jail medical staff did nothing other than instruct Mr. Stewart to "not lay on his right side and rest arm."

246.    Two hours later, Mr. Stewart advised Turn Key Nurse Sarah Garcia, LVN, of his arm and back pain.

247.    In response, Mr. Stewart was moved to a bottom bunk. Nurse Garcia did not alert any of this medical provider of Mr. Stewart's condition, complaints, or his decision making.

248.    On June 17, 2021, Nurse Albertson responded to a sick call placed by Mr. Stewart. Nurse Albertson noted that Mr. Stewart had increased pain and reduced range of motion in his left arm and a belief that it might be associated with his back.

249.    On June 19, 2021, Turn Key LPN Amanda Stehr observed Mr. Stewart "laying on the …floor" in distress with a pain rating of 10/10. She charted that Mr. Stewart asked "multiple times" to be transported to the hospital, that he was experiencing the worst pain he had ever been in and he could not handle it."

43

EXHIBIT 2

250.    In response, Nurse Stehr called a Turn Key NP, *whose only action was to prescribe an 800 mg ibuprofen, despite Mr. Stewart's obviously serious – and steadily worsening – symptoms and condition.*

251.    On June 21, 2021, Turn Key CRNP Becky Pata was informed that Mr. Stewart had fractured his L1 approximately three months previous, that he had experienced right shoulder pain since booking, and that he had a history of herniated discs.

252.    Pata observed Mr. Stewart limping and "obviously in a great deal of pain" before charting that she would "send to ER out of abundance of caution."

253.    After being transported to Norman Regional Hospital ("NRH"), Mr. Stewart's L1 compression fracture was confirmed.

254.    Mr. Stewart was returned to the Jail after his short visit to the NRH ER.

255.    On June 30, 2021, Mr. Stewart reported to Pata that he didn't feel well. He was taken back to NRH to be evaluated for pneumonia. Mr. Stewart reported symptoms including shortness of breath and unilateral leg swelling for the past month. After treating and discharging Mr. Stewart, NRH provided discharge instructions to the Jail and Turn Key that Mr. Stewart needed to return to the hospital in the event of "worsening symptoms or any symptoms of concern," "trouble breathing," or any "new symptoms or other concerns."

256.    On July 4, 2021, Mr. Stewart reported the following worsening or new conditions to Defendant Nurse Kariuki: 1) chest pain of 10/10; and 2) spitting up blood. Nurse Kariuki observed that Mr. Stewart appeared to be in distress with "reddish-green mucous...in the toilet."

257.    In response to these alarming (and new) symptoms, Kariuki did nothing other than click a preformatted box suggesting that she instructed him to "increase fluids, medication use, follow-up sick call if no improvement."

44

EXHIBIT 2

258.    Upon information and belief, Nurse Kariuki failed to report these symptoms to a physician, NP, PA, or RN, despite being aware of NRH's discharge instructions.

259.    On July 5, 2021, Mr. Stewart reported to Nurse Albertson additional worsening or new conditions, including difficulty breathing and persistent coughing.

260.    In response to these new symptoms/worsening condition, Nurse Albertson did nothing other than instruct Mr. Stewart to "take good deep breaths so as not to get pneumonia."

261.    On July 7, 2021, Mr. Stewart reported to CRNP Pata that he now was coughing up blood streaked sputum and had heartburn.

262.    Pata, despite having knowledge of the NRH discharge instructions, did not contact a physician or the hospital and merely ordered omeprazole and prednisone for Mr. Stewart.

263.    On July 14, 2021, Mr. Stewart reported the following worsening or new conditions to Turn Key LPN Christina Meza: 1) "woke up with blood dripping down the side of my face"; 2) pale-looking appearance; 3) persistent coughing; and 4) "leaning forward to breathe with hands on knees."

264.    Meza did nothing other than order Guaifenesin, a generic cough medicine. She did not report Mr. Stewart's condition to a physician or the hospital despite knowing of NRH's discharge instructions.

265.    Within an hour of Mr. Stewart's complaint to Meza, Turn Key and Jail staff allowed Mr. Stewart's release without disclosing the extent of his medical condition. Mr. Stewart was released to the custody of a deputy from Kingfisher county at approximately 7:59 p.m.

266.    No one informed the Kingfisher deputy of Mr. Stewart's emergent condition or NRH's orders to bring Mr. Stewart back to the hospital if he had new or worsening symptoms.

EXHIBIT 2

267.    Upon arrival at the Kingfisher Jail, approximately 60 miles from Norman, the medical staff at the Kingfisher Jail refused to admit Mr. Stewart based on his dire medical condition.

268.    The transporting deputy then took Mr. Stewart to a local hospital before he was transferred to a hospital in Enid where he died the following day, July 15, 2021.

269.    Mr. Stewart died due to acute bacterial endocarditis, acute respiratory failure, congestive heart failure, and hyponatremia.

270.    On August 3, 2021, Gregory Neil Davis was arrested by Oklahoma City Police Department ("OCPD") Officers and transported to the OCJ.

271.    Mr. Davis was charged with indecent exposure, and was observed by officers to be in the midst of an obvious mental health crisis.

272.    Upon arriving at the OCJ, Mr. Davis was not evaluated by Turn Key personnel, nor was he tested for COVID-19 or have his vital signs taken.

273.    Mr. Davis was finally seen by a Turn Key provider, Sanaria Okongor, LPC, on August 6, 2021. Ms. Okongo noted that Mr. Davis suffered from signs of psychosis, but she made no treatment recommendations or took any actions other than to recommend follow-up a few days later.

274.    Ms. Okongor saw Mr. Davis again on August 9, 2021 and again noted he appeared to be suffering from psychosis. Ms. Okongor again failed to make any treatment recommendations or take any actions, including taking vital signs or referring Mr. Davis to a higher-level provider.

275.    For at least the final few days of Mr. Davis's life – from August 9-12, 2021 – inmates in nearby cells heard Mr. Davis beating at his cell door, crying, and begging for medical

46

EXHIBIT 2

help but no one came to assist him, provide him medical care, or refer him to a physician or outside medical provider.

276.    On the morning of August 12, 2021, at approximately 6:45 a.m., Mr. Davis was observed in his cell in need of emergency medical attention by Lt. Morris and Ronald Anderson, employees and/or agents of the Oklahoma County Criminal Justice Authority ("OCCJA").

277.    Upon information and belief, EMSA was not called until approximately 9:17 a.m. When EMSA arrived, paramedics transported Mr. Davis to a nearby hospital, where he was pronounced dead.

278.    Mr. Davis died of a perforated duodenal ulcer, a condition that does not normally result in death unless left untreated for a substantial period of time, often more than 24 hours.

279.    From August 3-12, 2021, the only Turn Key personnel who saw, evaluated, assessed, or "treated" Mr. Davis was an LPC, who saw Mr. Davis on two occasions.

280.    Mr. Davis was never seen by a Turn Key physician nor was he referred to an outside medical provider other than the day of his death, when it was far too late.

281.    In August 2021, Larry Price, an intellectually disabled, 55-year-old inmate at the Sebastian County (Arkansas) Adult Detention Center, starved to death after responsible jail and Turn Key personnel failed to properly treat his medical and mental health conditions, including schizophrenia, for a year.

282.    The six foot, two inch Mr. Price entered the jail weighing approximately 185 pounds. By the time he was found unresponsive in his cell 366 days later, he weighed 90 pounds according to EMS reports. He had also been ingesting his own urine and feces according to reports.

283.    The medical examiner's report noted that Mr. Price was COVID-19 positive when he died, but the official cause of death was listed as *"acute dehydration and malnutrition."*

47

EXHIBIT 2

284.    Mr. Price encountered Dr. Lewis, but Dr. Lewis did nothing to ensure that Mr. Price was cared for.

285.    For over a year, Turn Key personnel watched as Mr. Price deteriorated both physically and mentally, doing nothing to assess, evaluate, or treat his conditions. Nor did Turn Key personnel refer Mr. Price to an outside medical provider.

286.    On December 24, 2021, Dean Stith, a 55-year-old Black man, was booked into the Tulsa County Jail after being arrested for the non-violent misdemeanor of false reporting of a crime.

287.    Mr. Stith suffered from numerous pre-existing medical and mental health conditions, including hypertension, bipolar disorder and/or schizophrenia, and serious dementia, which was obvious even to a layperson. Indeed, upon information and belief, the charges Mr. Stith faced – false reporting of a crime – were the result of symptoms of his dementia.

288.    During the book-in process, on December 25, 2021 at approximately 12:14 a.m., Turn Key employee/agent James Flora, LPN filled out an Intake Screening form. Pertinently, the Intake Screening form indicates that Mr. Stith: was being treated for hypertension; had an unstable gait; had open sores and wounds on both of his hands; was disheveled, disorderly, and insensible.

289.    Mr. Stith's condition continued to deteriorate throughout his stay at the Jail.

290.    On January 5, 2022, at approximately 4:29 p.m., Turn Key Nurse Practitioner Megan Rasor saw Mr. Stith for the purported purpose of "[hypertension] and wounds to BLE." NP Rasor charted that Mr. Stith was unable to recall his medication regimen and was "A&O [alert and oriented] to person and place only. Patient *has 2+ pitting edema to BLE with multiple open areas...* [38] Patient to wear compression hose but is noncompliant."

---

[38] Pitting edema is when a swollen part of your body has a dimple (or pit) after you press it

EXHIBIT 2

291.    On January 7, 2022, Mr. Stith's blood pressure was measured at 101/68, his pulse was 60, which is in the low range. Inexplicably, his oxygen saturation was not taken.

292.    Also on January 7, Judy Wagga, a Turn Key Psychiatric Nurse Practitioner, saw Mr. Stith and noted that he "appeared to be responding to internal stimuli." This was a sign that Mr. Stith was suffering from acute psychosis, an emergent situation.

293.    On January 8, 2022, Mr. Stith's pulse rose to 98 and his blood pressure rose to 124/97. Yet, despite these fluctuations, Mr. Stith was not put on any blood pressure medicine or given additional treatment.

294.    On January 9, 2022, Alicia Irvin, Turn Key psychologist, noted Mr. Stith's dementia and wrote that he had slurred speech, a new alarming symptom, and was not responding appropriately to questions. Dr. Irvin described Mr. Stith as having a "Major Neurocognitive Disorder." But Mr. Stith was not sent to an outside medical provider nor referred to a physician.

295.    Mr. Stith's pulse had also plummeted to 56, which is considered bradycardia. Bradycardia can be a serious problem if heart can't pump enough oxygen-rich blood to the body. Symptoms of bradycardia include confusion, such as the confusion repeatedly displayed by Mr. Stith.

296.    By this point it was abundantly clear that Mr. Stith was suffering from a condition that could not be adequately treated in a correctional setting. With negligence and deliberate indifference, Dr. Irvin, who is not a physician, failed to call for an ambulance or othiswise ensure that Stith was urgently evaluated by a physician.

---

for a few seconds. It can be a sign of a serious health issue, such as a blood clot, congestive heart failure, kidney disease, liver disease or *lung disease*. Nurse Lewis' note indicates that Mr. Stith had pitting edema in both legs.

EXHIBIT 2

297.    At approximately 2:46 p.m. on January 9, Turn Key Nurse Sarah Lewis, LPN, observed Mr. Stith *"drooling, tangential thought, not responding appropriately to questions, diminished skin turgor,*[39] *2+ pitting edema to BLEs, and full body weakness."* Nurse Lewis also noted that Mr. Stith was *unable to urinate*.

298.    Particularly when coupled with his worsening condition over a period of days, Nurse Lewis' note clearly reflects that Mr. Stith was in a dire condition and in obvious need of emergent care that could not be provided in a correctional setting. Nonetheless, with negligence and deliberate indifference, Nurse Lewis failed to call for an ambulance or even contact a physician.

299.    On January 10, 2022, at approximately 4:05 a.m., Mr. Stith was found wedged between his bunk and the wall in his cell. TCSO Detention Officer Davis notified Turn Key Nurses Nikki Copeland and Sarah Schumachis, who found that Mr. Stith was "cool to the touch and arms contracted to chest."

300.    EMSA was called and paramedics arrived at approximately 4:39 a.m., finding Mr. Stith unresponsive. The EMSA paramedics documented that Jail *"health care staff are poor historians and are unsure of timeline."*

301.    The paramedics noted that Mr. Stith was displaying decorticate posturing, which is a pose in which someone has rigid, extended legs, arms bent toward the center of their body, pointed and turned in toes, curled wrists, and balled hands. Decorticate posturing is caused by abnormal brain conditions such as a stroke, concussion, traumatic brain injury, brain bleed, brain tumor, or infection. Mr. Stith was transferred to St. John Medical Center whise he presented in cardiac arrest.

---

[39] A decrease in skin turgor is a late sign of dehydration.

EXHIBIT 2

302.    Providers at St. John were unable to resuscitate Mr. Stith, who passed away shortly after his arrival.

303.    The Office of the Chief Medical Examiner of Oklahoma determined that Mr. Stith died due to: 1) acute bronchopneumonia[40] due to complications of COVID-19; and 2) hypertensive athisosclerotic cardiovascular disease.

304.    On December 8, 2022, the horrific death of Shannon Hanchett occurred under the deliberate indifference of Turn Key at the Cleveland County Jail.[41]

305.    On December 20, 2022, one day before Luis Gonzalez died, an inmate at the Cleveland County Jail, Kathryn Milano, passed away.

306.    Upon information and belief, Ms. Milano had an extensive history of medical and mental health issues that were poorly controlled while she was housed at the Jail, consistent with the Jail's and Turn Key's policies and practices as discussed, *supra.*

307.    In February 2023, Joe Allen Sims, Jr., a mentally ill inmate who was supposed to be under "critical watch," died by suicide at the Cleveland County Jail.

308.    Mr. Sims was discovered by Jail staff 77 minutes after he hanged himself, despite the fact that he was supposed to be closely monitored due to his mental state.

309.    In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates.  And each of these inmates, with obvious, serious and emergent medical and mental health conditions, was kept at the jail when they clearly should have

---

[40] Symptoms of bronchopneumonia include muscle aches, confusion or delirium.

[41] *See* Amended Complaint, [Doc. No. 57], *Daniel Hanchett, as Personal Representative of the Estate of Shannon Hanchett, Deceased, v. Sheriff of Cleveland County, Turn Key Health Clinics, LLC, et al.,*Case No. 5:24-cv-00087-J (W.D. Okla.).

EXHIBIT 2

been transported to a hospital or another off-site provider capable of assessing and treating the conditions.

310. By its design, the Turn Key medical system was destined to fail.

311. At all pertinent times, Dr. William Cooper, D.O., was the "Medical Director" for Turn Key. In an effort to cut costs, Turn Key and Dr. Cooper spread the few physicians and mid-level providers they employ far too thin, making it impossible for them to medically supervise, let alone provide appropriate on-site medical care, at any of the county jails under contract with Turn Key.

312. In essence, Turn Key employs a small number of mid-level providers, such as physician's assistants or nurse practitioners, and physicians who travel all over the State (and sometimes to other states, such as Arkansas and Kansas) to the dozens of jails staffed by Turn Key for short blocks of time each week. This constitutes plainly insufficient medical staffing, particularly for a larger institution like the Oklahoma County Jail.

313. With no physician reasonably available to medically supervise the care provided to the inmates, undertrained personnel were left to practice outside the scope of their training and licensure.

314. In other words, Turn Key had a policy, practice or custom of inadequately staffing county jails, including the Oklahoma County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Luis Gonzalez, with complex and serious medical and mental health needs, including Type 1 diabetes, bipolar disorder, anxiety disorder, hypertension, dehydration, acute kidney injury, and hypoglycemia.

EXHIBIT 2

315.    With wholly inadequate physician oversight of the clinical care, the non- physician staff was improperly, and dangerously, expected to act in the role of a physician, with the understanding that off-site care was to be avoided.

316.    This system, designed to minimize costs at the expense of inmate care, obviously placed inmates with complex, serious and life-threatening medical and mental health conditions, like Luis Gonzalez, at substantial risk of harm.

317.    This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in constitutional deprivations.

318.    Oklahoma County/OCCJA/BOCC were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Luis Gonzalez at excessive risk of harm. However, Oklahoma County/OCCJA/BOCC failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Luis Gonzalez.

319.    Moreover, Dr. Cooper, Turn Key's Medical Director, has maintained a policy, at the corporate level, of intentionally omitting information about inmates' negative health outcomes from written documentation, and has ordered Turn Key personnel to keep such bad news out of written communications.

320.    This policy, in and of itself, constitutes deliberate indifference to the health and safety of Turn Key's patients.

321.    Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Luis Gonzalez.

EXHIBIT 2

322.    There is an affirmative link between the aforementioned unconstitutional acts and/or omissions of Turn Key staff, and policies, practices and/or customs which Turn Key promulgated, created, implemented and/or possessed responsibility for.

323.    Luis Gonzalez displayed alarming symptoms for the entirety of the ten days he was housed at the Jail, including Type 1 diabetes, bipolar disorder, anxiety disorder, hypertension, dehydration, acute kidney injury, and hypoglycemia. In deliberate indifference to these serious medical needs, no Turn Key employee/agent adequately treated Luis Gonzalez's symptoms and conditions. When his health deteriorated to the point that he was completely incoherent, was not eating or drinking, could not stand or sit up under his own power, and was found with his body covered in feces and presumably naked, when it was obvious he needed a highest level of care. This was callous and reckless indifference.

324.    It was obvious that Luis Gonzalez's conditions could not be effectively treated in a correctional setting. Yet, despite the obvious and excessive risks to his health and safety, the Turn Key employees/agents, refused to send him to the hospital or other facility with a highest level of care.

325.    Even if no single Turn Key employee/agent had violated Luis Gonzalez's constitutional rights, Turn Key would still be liable under a theory of a systemic failure of its policies and procedures as described herein. There were such gross deficiencies in the medical delivery system at the Jail that Luis Gonzalez was effectively denied constitutional medical care.

**Oklahoma County/OCCJA/BOCC Custom of Inadequate Medical Care**

326.    Counties may be held liable for the maintenance of an unconstitutional health care delivery system. In *Burke v. Regalado,* 935 F.3d 960 (10th Cir. 2019), the Tenth Circuit upheld a

54

EXHIBIT 2

jury verdict against the Tulsa County Sheriff for his failure to supervise based on evidence that he maintained a policy or custom of insufficient medical resources and training, chronic delays in care and indifference toward medical needs at the Tulsa County Jail. *See Burke,* 935 F.3d at 999-1001.[42]

327.    As evidenced, *supra,* Oklahoma County/OCCJA/BOCC have maintained an unconstitutional health care delivery system.

328.    Indeed, by simply retaining Turn Key as the medical provider at the Jail in light of the obviously substandard care that Turn Key has provided – and continued to provide – to inmates at the Oklahoma County Jail and county jails all over Oklahoma, Arkansas, and Kansas, Oklahoma County/OCCJA/BOCC were deliberately indifferent to inmates' serious medical needs.

329.    Oklahoma County/OCCJA/BOCC were aware, or should have been aware,[43] of Turn Key's repeated failures to provide constitutionally adequate medical care for inmates, yet Oklahoma County/OCCJA/BOCC made the conscious decision to retain Turn Key as the Oklahoma County Jail's medical provider.

---

[42] *See also v. Crowson v. Washington Cty. Utah,* 983 F.3d 1166, 1192 (10th Cir. 2020) (finding that a county may face liability based on "theory [of] systemic failure of medical policies and procedures"); *Burke v. Glanz,* No. 11-CV-720-JED-PJC, 2016 WL 3951364, at \*23 (N.D. Okla. July 20, 2016) ("[B]ased on the record evidence construed in plaintiff's favor, a reasonable jury could find that, in the years prior to Mr. Williams's death in 2011, then-Shisiff Glanz was responsible for knowingly continuing the operation of a *policy or established practice of providing constitutionally deficient medical care* in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams.").

[43] The negative medical outcomes discussed, *supra,* at jails in which Turn Key is the medical provider, have garnered substantial media attention. Further, upon information and belief, when Turn Key submits a request for proposal ("RFP") to a county when it is vying to become the jail's medical provider, Turn Key discloses a list of the current and previous lawsuits against it in which inmates, or an inmate's estate, has alleged constitutionally inadequate medical care.

EXHIBIT 2

330. In addition, Oklahoma County/OCCJA/BOCC utterly failed to train its detention staff in how to properly monitor, supervise, or care for inmates, like Luis Gonzalez, with complex or serious medical and mental health needs, with deliberate indifference to the health and safety of those inmates.

331. Oklahoma County/OCCJA/BOCC had abundant opportunity to increase funding, supervision and training which would haved allowed it to properly staff and address the systemic deficiencies, including severe deficiencies in its medical delivery system, that have plagued the Jail for years. Its failure to do so has resulted in injury to multiple detainees, including Luis Gonzalez. Its failure to take reasonable measures to alleviate known and substantial risks to inmates like Luis Gonzalez constitutes deliberate indifference at the municipal level.

## IV. CAUSES OF ACTION

### VIOLATION OF THE EIGHTH AND/OR FOURTEETH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

332. Plaintiff incorporates all previous allegations and statements as if fully restated herein.

**A. Individual Liability and Underlying Violation of Constitutional Rights**

**• Failure to Provide Adequate Medical Care**

333. Luis Gonzalez had obvious, severe, and emergent medical and mental health needs made known to Oklahoma County/OCCJA/BOCC and Turn Key, prior to his death.

334. Nonetheless, Oklahoma County/OCCJA/BOCC and Turn Key, disregarded the known and obvious risks to Luis Gonzalez's health and safety.

335. In deliberate indifference to his serious medical needs, health, and safety, Defendants failed to provide Luis Gonzalez with, *inter alia*, timely or adequate medical or mental

56

EXHIBIT 2

health treatment; proper monitoring and supervision; or reasonable access to outside medical providers who were qualified and capable of evaluating and treating him while he was placed under their care.

336.    As a direct proximate result of this unlawful conduct,  Luis Gonzalez suffered actual and severe physical injuries, physical pain and suffering, and emotional and mental distress and death.

337.    Jail Staff's conduct involved gross negligence, reckless or callous indifference to Luis Gonzalez's constitutional rights, in that Jail Staff acted in the face of and contrary to a perceived risk that their actions violated a constitutional right. Jail Staff were aware, or simply did not care, that there was a substantial risk that failing to monitor and treat Luis Gonzalez's medical conditions would cause him serious harm. Therefore, Plaintiff is also entitled to punitive damages for Jail Staff's gross negligence and reckless disregard of the rights Luis Gonzalez.

• **Failure to Provide Adequate Conditions of Confinement**

338.    Plaintiff incorporates all previous allegations and statements as if fully restated herein.

339.    During the 10 days Luis Gonzalez was in custody at the Oklahoma County Jail, he was denied housing on the 13th floor where he would have received immediate medical care.

340.    Instead, Luis Gonzalez was moved around the Oklahoma County Jail and even at one time housed on the 12th floor with the most dangerous inmates in the jail.

341.    Upon information and belief, Luis Gonzalez was stripped of his clothing and placed in a suicide prevention cell, although he was not a risk of suicide.

342.    Luis Gonzalez was denied commissary that thwarted his own desperate effort to self-regulate and self-medicate his blood sugar.

57

EXHIBIT 2

343.    In violation of Luis Gonzalez's rights under the Eighth and Fourteenth Amendments, Jail staff and Turn Key staff, failed to provide humane conditions of confinement by ensuring that Luis Gonzalez received the basic necessities of adequate food, liquids, medicine, and clothing.

344.    These conditions resulted in unquestioned and serious deprivations of basic human needs and posed a substantial risk of serious harm to the health and safety of Luis Gonzalez.

345.    Jail staff and Turn Key staff, knew of the excessive risks to the health and safety of Luis Gonzalez.

346.    Indeed, the risk was so obvious that no reasonable correctional officer or nurse could have concluded that it was constitutionally permissible to house Luis Gonzalez.in such deplorably dangerous conditions for such an extended period.

347.    Despite their knowledge of these serious deprivations of Luis Gonzalez's basic human needs, and the substantial risk of serious harm these deprivations posed to the health and safety of Luis Gonzalez., Jail staff and Turn Key staff, disregarded these risks.

348.    As a direct proximate result of the unlawful conduct of Jail and Turn Key staff, Luis Gonzalez suffered actual and severe physical injuries, physical pain and suffering, emotional and mental distress, loss of familial relationships and death.

349.    Jail Staff's conduct involved gross negligence, reckless or callous indifference to Luis Gonzalez's constitutional rights, in that Jail Staff acted in the face of and contrary to a perceived risk that their actions violated a constitutional right. Jail Staff were aware, or simply did not care, that there was a substantial risk that failing to provide Luis Gonzalez with adequate conditions of confinement would cause him serious harm. Therefore, Plaintiff is also entitled to

EXHIBIT 2

punitive damages for Jail Staff's gross negligence and reckless disregard of the rights Luis Gonzalez.

**B. Municipal Liability**

350.    Plaintiff incorporates all previous allegations and statements as if fully restated herein.

351.    The unconstitutional aforementioned acts or omissions are causally connected with customs, practices, and/or policies which Oklahoma County/OCCJA/BOCC and Turn Key promulgated, created, implemented and/or possessed responsibility for.

352.    To the extent that no single individual violated Luis Gonzalez's constitutional rights, Oklahoma County/OCCJA/BOCC and Turn Key are still liable under a theory of a systemic failure of Oklahoma County/OCCJA//BOCC and Turn Key policies, procedures, and customs as described herein. There were such gross deficiencies in training, supervision, facilities, practices, and procedures that Luis Gonzalez was effectively denied constitutional medical and mental health care.

353.    Those customs, practices, and/or policies are summarized, *inter alia*, in paragraphs 112-305 *supra*.

354.    Oklahoma County/OCCJA/BOCC and Turn Key knew, must have known or should have known that, by maintaining such customs, practices, and/or policies, detainees like Luis Gonzalez were at substantial risk of harm. Nevertheless, Oklahoma County/OCCJA/BOCC and Turn Key failed to take reasonable measures to alleviate the risk of harm.

355.    Turn Key is a "person" for purposes of 42 U.S.C. § 1983.

356.    At all times pertinent hereto, Turn Key was acting under color of State law.

EXHIBIT 2

357.    Turn Key was endowed by Oklahoma County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

358.    Turn Key was charged with implementing and assisting in developing the policies of Oklahoma County/OCCJA/BOCC with respect to the medical and mental health care of inmates at the Oklahoma County Jail and shared responsibility to adequately train and supervise its employees.

359.    In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

360.    There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Luis Gonzalez's serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key.

361.    Oklahoma County/OCCJA/BOCC and Turn Key, through their failure to take reasonable remedial measures has been deliberately indifferent to citizens', including Luis Gonzalez's, health and safety.

362.    Oklahoma County/OCCJA/BOCC and Turn Key maintained a healthcare delivery system at a corporate level, including at the Oklahoma County Jail, that has "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

363.    Oklahoma County/OCCJA/BOCC and Turn Key maintained a policy or custom of insufficient medical staffing, resources and training, chronic delays and indifference toward

EXHIBIT 2

medical needs of detainees and inmates. *See, e.g., Burke v. Regalado,* 935 F.3d 960, 999-1001 (10th Cir. 2019).

364.    The patently deficient medical delivery system, as designed by Oklahoma County/OCCJA/BOCC and Turn Key, resulted in a "systemic failure of medical policies and procedures". *Crowson v. Washington Cty. Utah,* 983 F.3d 1166, 1192 (10th Cir. 2020).

365.    Oklahoma County/OCCJA/BOCC and Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

366.    There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Luis Gonzalez's injuries and damages as alleged herein.

367.    As a direct and proximate result of the aforementioned customs, policies, and/or practices, Luis Gonzalez suffered injuries and damages as alleged herein.

**C. Negligence (Against Turn Key)**

368.    All preceding paragraphs are incorporated herein by reference.

369.    Turn Key is vicariously liable for the acts of its employees and/or agents under the doctrine of *respondeat superior*.

370.    Turn Key, through its employees and/or agents at the Oklahoma County Jail, owed a duty to Luis Gonzalez, and all other inmates incarcerated at the Oklahoma County Jail, to tender medical treatment with reasonable care, taking caution not to cause additional harm during the course of medical and/or mental health care and treatment.

371.    Any reasonable Jail employee knew or should have known those rights at the time of the complained of conduct as they were clearly established.

EXHIBIT 2

372.    As described herein, Turn Key, through its employees and/or agents, breached its duty to Luis Gonzalez, by failing to provide competent and timely medical and mental health care and treatment as required by applicable standards of care, custom and law.

373.    Turn Key staff, failed to provide adequate or timely evaluation and treatment, even as Luis Gonzalez's known medical and mental health conditions deteriorated. Agents and/or employees of Turn Key failed to reasonably or timely treat Luis Gonzalez's serious medical conditions, and prevented his timely transfer to a medical facility for emergent care.

374.    Turn Key's negligence is the direct and proximate cause of Luis Gonzalez's physical pain, severe emotional distress, mental anguish, death, loss of familial relationships, and the damages alleged herein.

375.    As a result of Turn Key's negligence, Plaintiff is entitled to damages.

376.    Furthermore, Turn Key's conduct involved gross negligence, reckless or callous indifference to Luis Gonzalez's constitutional rights, that it reveals that Turn Key acted in the face of and contrary to a perceived risk that their actions violated a constitutional right. Turn Key were aware, or simply did not care, that there was a substantial risk that failing to provide Luis Gonzalez with adequate medical care would cause him serious harm. Therefore, Plaintiff is also entitled to punitive damages for Turn Key's gross negligence and reckless disregard of the rights Luis Gonzalez.

## V. PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff respectfully prays this Court grant her the relief sought, including but not limited to actual and compensatory in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, punitive damages for Defendants gross negligence and reckless disregard of Luis Gonzalez's federally

EXHIBIT 2

protected rights where warranted, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

## VI. JURY DEMAND

Plaintiff demands a trial by jury of all issues.

DATED: December 16, 2024

Respectfully submitted,

Cameron Spradling, OBA No. 8509
CAMERON SPRADLING, PLLC
500 N. Walker Avenue, Suite 100
Oklahoma City, OK 73102
Telephone: (405) 605-0610
Facsimile: (405) 605-0615
*cameron@cameronspradling.com*

**ATTORNEY FOR PLAINTIFF**

**EXHIBIT 2**

**IN THE DISTRICT COURT IN AND FOR OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

| | | | |
|---|---|---|---|
| (1) | ANITA SUE GONZALEZ, individually and in her capacity as the Personal Representative of the Estate of LUIS ALBERTO GONZALEZ, JR., deceased, | § § § § § | |
| | Plaintiff, | § § | |
| | v. | § § | Case No. CJ-2024-8093 |
| (1) | OKLAHOMA COUNTY CRIMINAL JUSTICE AUTHORITY; | § § § | *Attorney Lien Claimed* *Jury Trial Demanded* |
| (2) | BOARD OF COUNTY COMMISSIONERS FOR OKLAHOMA COUNTY; | § § § | |
| (3) | TURN KEY HEALTH CLINICS, LLC, f/k/a ESW CORRECTIONAL HEALTHCARE; and | § § § § | |
| (4) | DOES 1-30. | § § | |
| | Defendants | § § | |

**SUMMONS**

To the above-named Defendant:     Turn Key Health Clinics, LLC
Attn: Jesse White
900 NW 12th Street
Oklahoma City, OK 73106

You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached **Plaintiff's Original Petition** in the court at the above address within twenty (20) days after service of this Summons upon you, exclusive of the date of service. Within the same time, a copy of your Answer must be delivered or mailed to the attorneys for the Plaintiff. Unless you answer the Petition within the time stated, judgment will be rendered against you with costs of the action.

Issued this 11th day of June 2025.        RICK WARREN, Court Clerk

_____, COURT CLERK

By: _____
(Seal)                          Deputy Court Clerk

**YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT, OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.**

The Summons and Plaintiff's Original Petition were mailed on June 11, 2025.

_____
Cameron Spradling

**EXHIBIT 2**